**ROYAL TYPEWRITER CO., DIVISION LITTON BUSINESS SYSTEMS, INC., Plaintiff-Appellant,**

v.

**M/V KULMERLAND, her engines, etc.,**

v.

**HAMBURG–AMERIKA LINIE, Defendant-Appellee.**

**No. 446, Docket 72–2067.**

United States Court of Appeals, Second Circuit.

Argued April 2, 1973.

Decided Aug. 13, 1973.

F. Herbert Prem, New York City (Bigham, Englar, Jones & Houston, New York City, on the brief), for plaintiff-appellant.

**646**

Michael J. Ryan, New York City (Cichanowicz & Callan, New York City, on the brief), for defendant-appellee.

Before KAUFMAN, Chief Judge, and ANDERSON and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This is a suit in admiralty by a consignee to recover damages for the loss of 350 cartons of adding machines shipped in a container. It raises in a somewhat different context from that of previously decided cases the question whether the limitation of $500 damages "per package" in the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300, 1304(5), applies only to the overall container itself, thus limiting the carrier's liability, cf. Encyclopedia Britannica, Inc. v. S. S. Hong Kong Producer, 422 F.2d 7, 20 (2d Cir. 1969) (Hays, J., dissenting) (the majority decided the case on a basis which precluded the use of the $500 package limitation), cert. denied sub nom. Universal Marine Corp. v. Encyclopedia Britannica, Inc., 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d 943 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967), or to each of the individual cartons so as to warrant recovery by the shipper for the loss of all its cartons. Cf. Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800, 814–816 (2d Cir. 1971). Judge Tyler below in a thoroughly reasoned opinion held that the entire container was the "package" in this case so that absent a declaration by the shipper of "the nature and value" of the goods therein, 46 U.S.C. § 1304(5), with payment of the accompanying higher transportation charge, the $500 package limitation was applicable. 346 F.Supp. 1019 (S.D.N.Y. 1972). We agree, on a slightly different basis, and, since a brief statement of the facts is necessary to analysis of the question presented, proceed to that statement.

The adding machines in question, worth approximately $29,000, were ordered and paid for by the consignee, Royal Typewriter Co. ("Royal"), from a Berlin manufacturer, Willi Feiler, GmbH ("Feiler"). Feiler delivered the 350 machines, together with 700 other machines, in single-wall corrugated cartons each approximately 15"x10"x10" in dimension, 12¼ pounds in weight, and sealed with thin paper tape, to a freight forwarder in West Berlin. There was evidence that shipment overseas of the machines in the individual cartons would have been totally impracticable and that before containers came into use the cartons were shipped overseas in lots of 12, 18 or 24 cartons packed in crates or wooden cases secured by metal bands.

Following Feiler's delivery to the freight forwarder, the latter pursuant to direction from the shipper placed the cartons in three Contrans containers, each containing 350 cartons, weighing about 4200 pounds and with sealed doors. These containers were loaded aboard the S. S. Kulmerland. This vessel was owned by Hamburg-Amerika Linie, which was the predecessor of appellee Hapag/Lloyd A.G. ("Lloyd"), a West German corporation and appellee here.

An ocean bill of lading was issued for all three containers including the one in question, No. 89. Under the heading "Number and kind of packages; description of goods" there is typed on the bill of lading as to each numbered container "1 Container said to contain Machinery," without any reference to the number of cartons of adding machines or to the fact that the "Machinery" consisted of adding machines. There is also the notation "Shipped on board and stowed under deck." The ocean freight chargeable for the shipping of Container 89 was $324.

While stored on arrival in New York in a "farm area" at a terminal at the foot of 17th Street, Container 89 was rifled of its contents. It is conceded on

this appeal that the carrier is liable for the loss, Leather's Best, Inc., *supra*, 451 F.2d at 807; David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 297–298 (2d Cir. 1964), cert. denied, 380 U. S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965), the only question being the amount of the loss in light of the COGSA damage limitation. For purpose of this appeal also the parties have agreed to dispose of the third party claims involving the terminal operator, its subcontractor and a protection service, among themselves so that the only issue to which we need direct our attention is the "package" one.

Appellant consignee strenuously urges that this case is governed by *Leather's Best, supra*, although the bill of lading there specifically referred to "1 container s.t.c. 99 bales of leather"; [1] the container there was 40'x8'x8' in dimension and weighed about 10 tons, and the agent furnishing the container was the ocean carrier's rather than the shipper's and the agent gave a receipt specifically covering the 99 bales. Appellant argues that these are distinctions without a difference. It urges that containers vary in size.[2] Appellant claims that it is immaterial whose agent obtains the container since the container is not an integral part of the shipment and does not become the property of the consignee.[3] And, appellant suggests, whether the bill of lading specifies the number of cartons contained is of no importance, because the applicable freight rate is the same whether or not the bill of lading refers to the number of bales or cartons in the container.[4] We incline to agree that these distinctions do not create as great a difference as the district court thought,[5] although we recognize that the

---

1. The abbreviation "s.t.c." means "said to contain."

2. Judge Tyler did note that "[t]he physical appearance of container 89 was unlike that of the metal containers so widely used in recent years by ocean carriers; as stated, the *container looked like the typical general cargo package.*" 346 F.Supp. 1019, 1024. *See also* Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 815 (2d Cir. 1971). But a divided panel of this court has held that two floored 3'x3' wooden pallets (containing visible cartons of TV tuners) were packages, Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d 943 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed. 2d 89 (1967), so that unusual appearance is not of too great weight. Both the Convention for International Transport of Goods Under Cover of T.I.R. Carnets, art. 1(c)(v) [1967], 2 U.S.T. 185, T.I.A.S. No. 6633, and its proposed supplement, Customs Convention on Containers Ch. I, art. 1(c)(vi), E/CONF. 59/46 (1972), define containers in part as "having an internal volume of one cubic metre or more." The container here in question was 10 cubic meters in volume. Containers are obviously available from suppliers as they were here, in varying sizes (apparently generally 8' wide and 8' high, but varying in length).

3. Containers are a handling, loading and stowing device of great convenience to the carrier. *Leather's Best, Inc., supra*, 451 F.2d at 815–816 n. 19. They also may provide benefit to the shipper in the form of lower shipping costs.

4. When packages are stowed in a container which is then locked and sealed, as is the practice, the number of packages is not verifiable. Under COGSA, 46 U.S.C. § 1303(3)(c), the bill of lading need not show a quantity which the carrier "has had no reasonable means of checking." Hence it can be argued that the quantity of packages contained may be irrelevant. Freight rates, moreover, are based on the nature of the goods and weight or dimensions of the container, not the number of packages. This court did say, however, in Nichimen Co. v. M.V. Farland, 462 F.2d 319, 335 (2d Cir. 1972), that "While the description on the bill of lading is not controlling . . . it is important evidence of the parties' understanding . . . ."

5. The decision below has been sharply criticized in Simon, Latest Developments in the Law of Shipping Containers, 4 J.Mar.L. & Com. 441 (1973). Attorney Simon, who was counsel for the losing appellant in *Standard Electrica, supra*, applauds *Leather's Best, supra*, as holding under "sagacious and correct reasoning," *id.* at 442, that "a container is not a 'package.'" The *Leather's Best* opinion, however, is not as broad as Simon states, as it left open the result if the shipper had packed the goods "in a container already on its premises and the bill of lading had given no information with respect to the number of bales." 451 F.2d at 815.

district court was steering a difficult course between *Standard Electrica* on the one hand and *Leather's Best* on the other, with Judge Hays' dissent in *Encyclopedia Britannica, supra,* thrown in for good measure, all in a field crying for new legislative action [6] in the light of economic and transportation developments.[7] We also realize that the learned district judge has changed his own position on the law somewhat: as his subsequent opinion in Rosenbruch v. American Export Isbrandtsen Lines, Inc., 357 F.Supp. 982 (S.D.N.Y.1973), explicates, he now seeks a test with ease of predictability in litigation involving shipper-packed containers—calling a container a § 4(5) "package" when it contains the goods of a single shipper, without regard to "[t]he accident of notations on the bill of lading." He does this on the basis of the underlying policy that COGSA was intended to let the shipper obtain at his option marine insurance coverage, if he prefers the cheaper freight rates of larger packages.

But we think this approach tends to beg the statutory question of what is a "package." [8] Moreover, the real parties in interest in this kind of case may be the marine insurers themselves, so that it is no answer to say that the availability of marine insurance is the determinative factor. As Chief Judge Friendly points out in *Leather's Best,* 451 F.2d at 815: " . . . for all we know, a ruling that each bale constituted a 'package' may simply be conferring a windfall on the cargo insurer . . . if it based its premium on the assumption that [the carrier's] liability was limited to $500."

The statutory purpose here leads us to suggest what for want of a better term we will call the functional economics test. In this regard, the first question in any container case is whether the contents of the container could have feasibly been shipped overseas in the individual packages or cartons in which they were packed by the shipper.[9] Here it is

6. The United States has with the United Kingdom and 18 other countries signed the 1968 Brussels Protocol, raising the rather unrealistic COGSA package limitation. The Protocol, however, has within it in Article 4(5) a "container clause," see DeGurse, The "Container Clause" in Article 4(5) of the 1968 Protocol to the Hague Rules, 2 J.Mar.L. & Com. 131 (1970), and there is considerable doubt whether it will be ratified as a result. *See* the exchange of correspondence between the State Department and an interested party set forth in Editor's Note, 3 J.Mar.L. & Com. 209, 210–11 (1971). The State Department there appeared to take the position that the clause and the Protocol might need to be changed in part depending on the outcome of *Leather's Best* (then on appeal) and specifically said "it does not appear to us that it would be prudent to proceed with ratification until the international and domestic legal situation is clearer." *Id.* at 211.

7. One economic development is, of course, the decrease in the value of the dollar between 1936 when COGSA was adopted and the present. One transportation development, surely not envisaged by Congress in 1936, was the use of containers as we know them for shipping.

8. We do not of course pass upon *Rosenbruch,* now on appeal. That case involves the still different factual question of household goods being shipped in a single 40'x8'x8' container and it does not appear how they were packed therein.

9. *See Encyclopedia Britannica, supra,* 422 F. F.2d at 20 (Hays, J., dissenting): "I would thus hold that the parties intended each individual container to be considered as the functional packing unit . . . ." *Standard Electrica* is by no means inconsistent with a "functional packing unit" test; there "the shipper . . . chose to make up the cartons into a pallet, apparently for the reasons of greater convenience and safety in handling." 375 F.2d at 946. *But see* 375 F.2d at 947–948 (Feinberg, J., dissenting): "Strapping six cartons together on a platform with a board on top 'to prevent other cargo and the [four metal] straps from cutting into the top two cartons' did not make a package out of the six cartons, since the pallet was not also enclosed on the sides." So too in *Leather's Best,* the court (Friendly, C. J.) says that " 'package' is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be 'con-

plain that they could not feasibly have been shipped in those individual cartons; adding machines are a delicate product—their little cardboard cartons, stapled and paper-taped, had never been shipped as such; in the days before containers they were shipped in wooden crates or cases containing 12 to 24 each. The metal containers in which the cartons were shipped in lots of 350 per container are essentially to be likened to the wooden crates or cases of days past; the use of the metal container of convenience to shipper and carrier alike was selected by the shipper and used without carrier objection. This court, in a different factual context in Nichimen Co. v. M.V. Farland, 462 F.2d 319, 334 (2d Cir. 1972), referred to Black's Law Dictionary 1262 (4th ed. 1951), which defines a package as a "bundle put up for transportation or commercial handling . . . . a thing in form suitable for transportation or handling." Until the adding machine cartons were packed in the container in question they were not suitable for ocean transportation or handling.

We suggest that underlying *Leather's Best, supra,* is the concept that the "bales" there could have been shipped individually rather than in the container ultimately held not to be a "package." *See* note 9 *supra.* Here, however, the individual cartons containing one adding machine each were simply not packing units suitable for overseas shipment. We view *Leather's Best* as holding that, where the shipper's own packing units are functional, a presumption is created that a container is not a "package" which must be overcome by

evidence supplied by the carrier that the parties intended to treat it as such. Thus, this case is clearly distinguishable from *Leather's Best.* When, as here, the shipper's own individual units are not functional or usable for overseas shipment the burden shifts to the shipper to show why the container should not be treated as the "package." The shipper has not met that burden here. While in *Standard Electrica* it is unclear whether or not the cartons could have been shipped as a practical matter in the absence of pallets, note 9 *supra,* we treat that case in its own language as one in which the parties' apparent intent was given "considerable weight," 375 F.2d at 946: the pallets there were characterized by the parties as packages.

Absent shipment in a functional packing unit, the burden is on the shipper to show by other evidence that his units are themselves "packages." Only then does custom and usage in the trade, the parties' own characterization or treatment of the items being shipped in supporting documentation or otherwise, and any other factor bearing on the parties' intent become relevant, as in *Standard Electrica* or *Leather's Best.*

The "functional package unit" test we propound today is designed to provide in a case where the shipper has chosen the container a "common sense test" under which all parties concerned can allocate responsibility for loss at the time of contract, purchase additional insurance if necessary, and thus "avoid the pains of litigation." *Standard Electrica, supra,* 375 F.2d at 945.

Judgment affirmed.

tained.'" 451 F.2d at 815. The leather "bales" in *Leather's Best* were cartons 4'x2'x 1½' with steel straps. Thus the court in Nichimen Co. v. M.V. Farland, *supra,* 462 F.2d at 334, held that coils of steel were pack-

ages, whether or not they were wrapped in burlap, where sheet steel was rolled, strapped and tied with steel bands so as to be easier to handle.