CROFT & SCULLY CO., Plaintiff,

v.

M/V SKULPTOR VUCHETICH, Her Engines, Tackle, Apparel, Etc., Baltic Shipping Company, Goodpasture, Inc., and Shippers Stevedoring, Inc., Defendants.

Civ. A. No. H–78–2202.

United States District Court,
S. D. Texas,
Houston Division.

Feb. 3, 1981.

R. M. Sharpe, Jr. and Stuart B. Collins, Sharpe & Kajander, Houston, Tex., for plaintiff.

Gus A. Schill, Jr., Robert H. Etnyre, Jr. and John M. Elsley, Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

Pending before the Court are cross motions for summary judgment filed by plaintiff and by defendants Goodpasture, Inc. (Goodpasture) and Shippers Stevedoring, Inc. (Shippers Stevedoring). Each party has filed a response in opposition to the other's motion, and the parties have filed memoranda in support of their respective positions. After careful consideration of the memoranda, accompanying exhibits and arguments, the Court concludes that no issues of material fact exist and that defendants are entitled to judgment as a matter of law. See Rule 56, Fed.R.Civ.P. Accordingly, defendants' motion is granted, and plaintiff's motion is denied.

### I. Introduction

Plaintiff brought this cause to recover compensation for damage incurred on December 8, 1977, to some or all of 1755 cases of canned soft drinks. The facts of the cargo damage incident are undisputed. The 1755 cases of canned soft drinks were loaded by employees of the shipper's supplier into a twenty foot container which was owned by the carrier. The container was trucked by the shipper's supplier to Goodpasture's yard adjacent to the Houston Ship Channel. Goodpasture was selected by the vessel's owner or representative to store the container until it could be loaded onboard the M/V Skulptor Vuchetich. The vessel's owner or representative also appointed Shippers Stevedoring to load the container onboard the vessel. In order to do so, the superintendent of Shippers Stevedoring directed an employee to bring the container to the wharf, and the employee proceeded with a forklift machine owned by Shippers Stevedoring to the shore side stowage location of the container. The forklift operator picked up the twenty foot container, and as he was proceeding to place the container on a flatbed truck, the container slipped from the forklift and fell to the ground.

No employee of Goodpasture was involved in the sequence of events which resulted in damage to some or all of the cases of canned soft drinks. Employees who arranged for the container to be loaded aboard the vessel were Shippers Stevedoring employees. The forklift operator was employed by Shippers Stevedoring. The parties have stipulated that no agency relationship exists between Goodpasture and Shippers Stevedoring; therefore, as a matter of law, Goodpasture is not liable to plaintiff for the negligent acts of Shippers Stevedoring. Accordingly, the Court concludes that summary judgment should be entered in favor of defendant Goodpasture.

The parties additionally have stipulated that Shippers Stevedoring was negligent in handling plaintiff's cargo on December 8, 1977 and that said negligence proximately caused damage to plaintiff's cargo. Two issues thus remain for resolution by the Court: (1) whether clause 17 of the Baltic Shipping Company bill of lading extends the benefit of section 4(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5) (1975), to Shippers Stevedoring; and (2) whether the container in question is

a package pursuant to Section 4(5) of COG-SA.[1]

## II. The Himalaya Clause

■ The liability of stevedores is not limited by the terms of Section 1304(5) of the statute,[2] *see Herd & Company v. Krawill Machinery Corporation,* 359 U.S. 297, 301–02, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959); however, the parties to an ocean bill of lading may extend the benefit of COGSA limitations of liability to stevedores and other parties who stand in the chain of the carriage contract. *See Herd & Company v. Krawill Machinery Corporation,* supra, at 302–03, 79 S.Ct. at 769–70. Defendants

contend that clause 17[3] of the governing bill of lading[4] extends the $500-per-package limitation of liability to Shippers Stevedoring. As Shippers Stevedoring was not a party to the contract of carriage, its liability for negligence may be limited pursuant to COGSA only if the language of clause 17 clearly indicates that Shippers Stevedoring is an intended beneficiary. *See, e. g., Warta Insurance and Reinsurance Company, Ltd. v. Calumet Harbor Terminals, Inc.,* 1978 A.M.C. 2244, 2245 (N.D.Ill.1978). Further, any such limiting clauses must be strictly construed against the parties whom they are claimed to benefit.[5] *See, e. g., Herd & Company v. Krawill Machinery Cor-*

1. An additional issue raised in defendants' motion is uncontested by the plaintiff: plaintiff admits that COGSA is the controlling statutory scheme in the instant cause. Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 2–3. Clause 1 of the bill of lading at issue incorporates COGSA and specifies that the Act shall govern "before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier." Inasmuch as the cargo damage herein occurred prior to the goods' being loaded aboard the vessel, COGSA does not apply *ex proprio vigore, see* 46 U.S.C. § 1301(e) (1975); however, the parties do not contest the applicability of the Act through the incorporation by reference accomplished in Clause 1, and the Court finds that COGSA controls the instant issue. *See, e. g., Pannell v. United States Lines Company,* 263 F.2d 497 (2d Cir.), *cert. denied,* 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959).

Another issue treated separately in defendants' memoranda is whether the shipper was afforded an opportunity to declare a higher value for the cargo in question. The Court considers that issue to be subsumed by the broader question of whether the container is a COGSA package and has analyzed it accordingly. *See, e. g., In Re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383, 392 (E.D.Va.1979). Refer to discussion at pp. 684–685 & note 19, *infra.*

2. The section provides, in pertinent part: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in any amount exceeding $500 per package...." 46 U.S.C. § 1304(5) (1975).

3. Clause 17 provides, in pertinent part, the following:

In case of any loss or damage to or in connection with goods exceeding an actual value of $500.00 lawful money of the United States,

per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500.00 per package or per unit, on which basis the freight is adjusted, and the carrier's liability, if any, shall be determined on the basis of a value of $500.00 per package or per customary freight unit or prorata in case of partial loss or damage....

The limitations of liability and other provisions contained in this article shall inure not only to the benefit of the carrier, its agents, servants and employees, but also to the benefit of any independent contractor performing services including stevedoring in connection with the goods hereunder.

The bill of lading in the instant cause was made subject to the provisions of COGSA pursuant to Clause 1; refer to note 1, *supra.* Clause 17 specifically discusses the package limitation found in Section 4(5) of COGSA, 46 U.S.C. § 1304(5) (1975).

4. Inasmuch as the damaged container never was loaded onboard the M/V Skulptor Vuchetich, the bill of lading was not signed by the vessel's Master. Nevertheless, the terms of the bill govern the carriage agreement. *See Baker Oil Tools, Inc. v. Delta Steamship Lines, Inc.,* 562 F.2d 938, 940 n.3 (5th Cir. 1977), *rehearing en banc denied,* 571 F.2d 978 (5th Cir. 1978).

5. Plaintiff asserts that because the bill of lading is a contract of adhesion, the shipper has no right to negotiate and, therefore, even an express extension of a contractual benefit to a third party does not reflect a clear intention on the part of the shipper. Plaintiff's contention, if adopted, apparently would foreclose any Himalaya clause extension of contract benefits to third party beneficiaries because the clear intention standard of *Herd & Company v. Krawill Machinery Corporation,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959) could not be met as a matter of law.

*poration, supra*, at 303–05, 79 S.Ct. at 770–71; *Bernard Screen Printing Corporation v. Meyer Line*, 464 F.2d 934, 936 (2d Cir. 1972) (per curiam), *cert. denied*, 410 U.S. 910, 93 S.Ct. 966, 35 L.Ed.2d 272 (1973).

■ The clause at issue expressly extends the COGSA limitation of liability to "the benefit of any independent contractor performing services including stevedoring in connection with the goods hereunder." When analyzing similar language of other such clauses, various courts have found the questioned provisions of sufficient clarity to reflect the understanding of the parties so that the benefits would be extended to the third party. *See, e. g., Grace Line, Inc. v. Todd Shipyards Corporation*, 500 F.2d 361, 371 (9th Cir. 1974); *Tessler Brothers (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 445–46 (9th Cir. 1974); *Bernard Screen Printing Corporation v. Meyer Line, supra*, at 935–36; *Secrest Machine Corporation v. S.S. Tiber*, 450 F.2d 285, 287 (5th Cir. 1971); *Brown & Root, Inc. v. M/V Peisander*, # 75–H–2193 (S.D.Tex. September 30, 1977) (unpublished opinion) at 5, *appeal pending*, # 77–3277 5th Cir.; *Miehle Company v. Hapag-Lloyd Aktiengesellschaft*, 1975 A.M.C. 654, 656 (S.D.Tex.1974); *Dorsid Trading Company v. S.S. Fletero*, 342 F.Supp. 1, 6 (S.D.Tex.1972); *Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, Inc.*, 275 F.Supp. 76, 78–79 (S.D.N.Y. 1967), *aff'd*, 386 F.2d 839 (2nd Cir. 1967),

*cert. denied*, 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968). The decisions in which the courts have accorded COGSA protections to third parties indicate that a negligent stevedore can avail itself of a limitation of liability, or other contractual benefits, only if the clause relied upon to confer the extension of benefits specifically refers to "stevedores" or "independent contractors".

As a result of utilizing strict construction, several courts have found the language in exculpatory clauses too general to reflect clearly that the contracting parties intended the benefits to be extended to the third party seeking to invoke protection. *See, e. g., Toyomenka, Inc. v. S.S. Tosaharu Maru*, 523 F.2d 518, 520–22 (2d Cir. 1975); *DeLaval Turbine, Inc. v. West India Industries, Inc.*, 502 F.2d 259, 267–68 & n.10 (3rd Cir. 1974); *Rupp v. International Terminal Operating Company, Inc.*, 479 F.2d 674, 676–77 (2d Cir. 1973); *Cabot Corporation v. S.S. Mormacscan*, 441 F.2d 476, 478–79 (2d Cir. 1971), *cert. denied sub nom., John W. McGrath Corporation v. Cabot Corporation*, 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971); *Warta Insurance and Reinsurance Company, Ltd. v. Calumet Harbor Terminals, Inc., supra*, at 2245; *LaSalle Machine Tool, Inc. v. Maher Terminals, Inc.*, 1978 A.M.C. 1374, 1379–80 (D.Md.1978); *Pan American World Airways, Inc. v. California Stevedore and Ballast Company*, 1978 A.M.C. 1839, 1840–41 (N.D.Calif.1975).

In addition, some question arises whether bills of lading any longer are susceptible to being automatically characterized as adhesion contracts. *See Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir. 1971); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 19 (9th Cir.) (Hays, J., dissenting), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); DeOrchis, *The Container and the Package Limitation—The Search for Predictability*, 5 J.Mar.L. & Com. 251, 258 (1974); *cf. Cabot Corporation v. S.S. Mormacscan*, 441 F.2d 476, 478 (2d Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971) ("In this bill of lading, a contract of adhesion prepared by the carrier . . ., limitations of liability are to be construed most strongly against the parties who introduced them into the contract.") *id.* at 478 (citation omitted).

Determination of any generally applicable character of bills of lading is unnecessary to

the resolution of the issues before the Court. Refer to discussion of legislative intent in promulgating COGSA at pp. 680–682, *infra*. Inflexible adoption of plaintiff's thesis would evoke a remedy too drastic and not heretofore subscribed to by any court. *See, e. g., Grace Line, Inc. v. Todd Shipyards Corporation*, 500 F.2d 361, 372 (9th Cir. 1974); *Tessler Brothers (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 445 (9th Cir. 1974). The Court concludes that the *Herd* standard of strict construction to effectuate the clear intention of the contracting parties is adequate protection against the adhesive character of particular bills of lading. *See, e. g., Grace Line, Inc. v. Todd Shipyards Corporation, supra*, at 372; *Cabot Corporation v. S.S. Mormacscan, supra*, at 478; *LaSalle Machine Tool, Inc. v. Maher Terminals, Inc.*, 1978 A.M.C. 1374, 1379 (D.Md.1978).

The clause herein at issue expressly includes both stevedores and independent contractors. The Court, therefore, concludes that the provision clearly reflects an understanding by the contracting parties that Shippers Stevedoring was to be covered by the limitations of liability.[6] Accordingly, the $500-per-package maximum described in clause 17 is applicable to limit the liability of Shippers Stevedoring for its negligence.

### III. The Package Limitation

The facts involved in the cargo preparation sequence are undisputed. The shipper's representative contacted the vessel's local agent regarding the shipment of the canned soda pop, and a specific booking for space was made on board the M/V Skulptor Vuchetich at the request of the shipper through the vessel's local agent. Thereafter, the twenty (20) foot container, which was owned by defendant Baltic Shipping Company (the ocean carrier), was obtained through the vessel's local agent at the shipper's request, and the container was sent to Wharton to be loaded by the shipper's supplier, Wharton Beverage Company. Each of the 1755 cases of soft drinks consisted of twenty-four (24) pull-tab, twelve (12) ounce cans which were "loose packed" into a corrugated cardboard box. Each corrugated cardboard box was cut in half so that the top half of each can was exposed with no protective covering. The 1755 cases then were loaded into the container by employees of Wharton Beverage Company, and the container was sealed by their employees. No representative of the ocean carrier, terminal operator or loading stevedore was present during the loading and sealing of the container, and the only cargo that was packed into the container consisted of the shipper's 1755 cases of canned soda pop.

The container thereafter was trucked by Wharton Beverage Company to Goodpasture's yard adjacent to the Houston Ship Channel; Goodpasture was selected by the vessel's owner or representative to store the container until it could be loaded on board the M/V Skulptor Vuchetich. The vessel's owner or representative also appointed Shippers Stevedoring to load the container on board the vessel. Shortly after the container was received at Goodpasture's yard, it was placed on Tank Pad No. 11, a level concrete slab which was approximately six to eight inches higher than the yard. The vessel was scheduled to arrive at Goodpasture's dock on December 8, 1977. Prior to that date, the vessel's local agent, Moram Agencies, prepared a bill of lading on the vessel owner's form. The vessel did arrive at Goodpasture's dock on the scheduled date; the facts involved in the loading procedure have been outlined in the introductory section of this Memorandum and Order. Refer to p. 672, *supra*.

As acknowledged by courts and commentators, the issue of what is a package and more specifically, how containers relate to the COGSA $500-per-package limitation is one which has engendered much confusion and conflict among jurists. To date it remains unresolved. *See, e. g., In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383 (E.D.Va.1979); Bissell, *The Operational Realities of Containerization and their Effect on the "Package" Limitation and the "On-Deck" Prohibition: Review and Suggestions,* 45 Tulane L.Rev. 902, 905, 911–15, 943–46 (1971). "The problem [of making technological advances in transportation conform to the

---

**6.** In *LaSalle Machine Tool, Inc. v. Maher Terminals, Inc.,* 1978 A.M.C. 1374 (D.Md.1978), the Court considered an exculpatory clause containing language identical to that of the clause herein at issue, and remarked of the provision that "it is not a model of clarity and is so broad as to be unreasonable." *Id.* at 1380. In that case, however, the limitation was being claimed by a terminal operator, "of which the shipper had never heard, which gave no dock receipt or other evidence that the ocean bill of lading provisions were applicable, and which, by striking the case in question from the inland bill of lading, indicated that it was not treating that case as having been delivered to it as an agent or other representative of the carrier." *Id.* at 1380. This Court finds the instant cause distinguishable in that the container herein at issue was included on the bill of lading, and the third party here seeking the benefit of the clause is included specifically in the clause.

limitation of liability promulgated in 1936] demands a solution better than the courts can afford, . . . . Meanwhile the courts must wrestle with a statutory provision that has become ill-suited to present conditions." *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 814–15 (2d Cir. 1971) (citations omitted); *see also, Yeramex International v. S.S. Tendo*, 1977 A.M.C. 1807, 1828–29 (E.D.Va.1977) (In observing that the decisions concerning when a container is a package "are less than harmonious, in spite of efforts . . . to harmonize them," *id.* at 1829, the Court identified the genesis of much of the litigation on this issue: "The $500 package limitation was enacted in 1936 before the advent of containerized shipping. At that time, $500 fairly reflected the average worth of an average parcel shipped. Today, however, large numbers of parcels may be stuffed into one container . . . ." *Id.* at 1828).

The judicial wrestling has resulted not only in conflicting resolutions of virtually identical container-contents questions, *compare Inter-American Foods, Inc. v. Coordinated Caribbean Transport, Inc.*, 313 F.Supp. 1334 (S.D.Fla.1970) *with United Purveyors, Inc. v. Motor Vessel New Yorker*, 250 F.Supp. 102 (S.D.Fla.1965), but also in an evolution of various seemingly incompatible standards by which courts evaluate the package issue. *Compare Royal Typewriter Co., Division Litton Business Systems, Inc. v. M/V Kulmerland*, 483 F.2d 645 (2d Cir. 1973) *and Hartford Fire Insurance Company v. Pacific Far East Line, Inc.*, 491 F.2d 960 (9th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974) *with In re Complaint of Norfolk, Baltimore & Carolina Line, Inc., supra, and Mitsubishi International Corporation v. S.S. Palmetto State*, 311 F.2d 382 (2d Cir. 1962), *cert. denied*, 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963). Inasmuch as the United States Court of Appeals for the Fifth Circuit has announced no standard by which this Court may be guided, *see, e. g., Spartus Corporation v. S/S Yafo*, 590 F.2d 1310, 1317 (5th Cir. 1979), this Court must compare and contrast decisions rendered in other circuits to determine what mode of analysis is most appropriate for resolution of the package issue in the instant cause.

■ Not unlike the various courts which have struggled with the package issue, the parties herein have adopted, and assert as controlling, what can be characterized as conflicting standards.[7] Plaintiff asserts that the standard which most fully reflects the intent of Congress in promulgating COGSA involves examination of only two factors: (1) whether the carrier or the shipper owns the container; and (2) whether the bill of. lading provides notice to the carrier of the contents of the container. Defendants rely on a factor analysis which was developed by the United States Court of Appeals for the Second Circuit and which has been labeled a "functional economics test". *Royal Typewriter Co., Division Litton Business Systems, Inc. v. M/V Kulmerland, supra*, at 648. This Court concludes that neither standard, alone, presents a satisfactory resolution of the analytical method which should be used to determine whether a container is a package.

■ The starting point for this Court's process of identifying an appropriate analytical construct is an examination of methods of analysis which have been adopted by other courts. Most of the decisions on the package limitation issue have been rendered by courts of the Second Circuit, and some of those courts have developed the standard relied upon by defendants; the "functional economics test". *See, e. g., Royal Typewriter Co., Division Litton Business Systems, Inc. v. M/V Kulmerland, supra*, at 648. The first inquiry for a court using such a test is whether the goods as packaged by

---

7. Both plaintiff and defendants have briefed all issues extensively through a series of responsive memoranda. In order to simplify the required analysis, the Court concludes that each party's position on the package issue substantively can be reduced to. a "lowest common denominator". Accordingly, the Court has scrutinized all contentions and the authority presented therefor of each party and attempted to identify and label the primary thrust of the arguments of each.

the shipper prior to their being placed in the container were fit for shipping and transport, *i. e.,* whether the packaging units were functional. "When the shipper's own packaging units are functional, a presumption is created that a container is not a package. Conversely, when the shipper's own individual packaging units are not functional or usable in overseas shipment then a presumption is created that the container is a 'package'." *Armstrong Cork Canada, Ltd. v. S.S. Red Jacket,* # 74–2770 (S.D.N.Y. December 21, 1979) (slip opinion). The presumption is rebuttable by evidence that the parties intended the opposite result, and courts have utilized various factors to assess the parties' intent.[8]

The Second Circuit has described the functional economics test as "by no means conclusive of the result; it simply goes to the burden of proof." *Cameco, Inc. v. S.S. American Legion,* 514 F.2d 1291, 1299 (2d Cir. 1974). This Court recognizes that the

test does not preclude consideration of additional factors to resolve the container/package inquiry, and that the test likely accomplishes an appropriate resolution of the package problem in the factual context of some cases. The test, however, does require a court to place heavier emphasis on one factor out of many that may be pertinent in other factual contexts in which the container/package inquiry arises. Further, the test as a method of analysis has potential for promoting economic waste. *See, e. g.,* Simon, *The Law of Shipping Containers,* 5 J.Mar.L. & Com. 507, 522–24 (1974) (hereinafter Simon); DeOrchis, *The Container and the Package Limitation—The Search for Predictability,* 5 J.Mar.L. & Com. 251, 257 (1974) (hereinafter DeOrchis). One of the advantages of containerization is that "expensive packing required for overseas break-bulk shipments can be avoided." DeOrchis, *supra,* at 257. For certain types

**8.** The factors most frequently relied upon include the following: (1) who secured, packed and sealed the containers, and, if the shipper did so, whether a representative of the carrier was present, *see, e. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc.,* 543 F.2d 967, 970 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *Eastman Kodak Company v. S/S Transmariner,* 1975 A.M.C. 123, 128 (S.D.N.Y.1974); *Insurance Company of North America v. S/S Brooklyn Maru,* 1974 A.M.C. 2443, 2447 (S.D.N.Y.1974); (2) whether the goods of only one shipper were placed in the container, *see, e. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc., supra,* at 970; *Insurance Company of North America v. S/S Brooklyn Maru, supra,* at 2446; and (3) how descriptive the language is in the bill of lading, *see e. g., Cameco, Inc. v. S.S. American Legion,* 514 F.2d 1291, 1299 (2d Cir. 1974); *Armstrong Cork Canada, Ltd. v. S.S. Red Jacket,* # 74–2770 (S.D.N.Y. December 21, 1979) (slip opinion); *Insurance Company of North America v. S/S Brooklyn Maru, supra,* at 2446.

Other factors which have been weighed include custom and usage in the trade, *see, e. g., Royal Typewriter Co., Division Litton Business Systems, Inc. v. M/V Kulmerland,* 483 F.2d 645, 649 (2d Cir. 1973), and for whose benefit the container was used, *see, e. g., Armstrong Cork Canada, Ltd. v. S.S. Red Jacket, supra.* This Court has determined that the criterion involving which party benefited from the use of the container is one which deserves little weight in the package inquiry, refer to note 11, *infra.* Accordingly, the Court has not included

that factor in the list of applicable criteria it has formulated for analyzing the container/package issue. Refer to discussion at pp. 684–685, *infra.* All of the above factors bear on the intent of the parties, *see, e. g., Royal Typewriter Co., Division Litton Business Systems, Inc. v. M/V Kulmerland, supra,* at 649; *Armstrong Cork Canada, Ltd. v. S.S. Red Jacket, supra,* and are to be applied as the second portion of the functional economics test after resolution of the initial inquiry concerning the sufficiency of the shipper's packaging for shipment.

The same factors are weighed by courts which have not used or have criticized the functional economics test, *see, e. g., Smythgreyhound v. M/V Eurygenes,* # 75–2914 (S.D.N.Y. August 26, 1980) (slip opinion); *In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383 (E.D.Va.1979); *cf. Matsushita Electric Corporation of America v. S.S. Aegis Spirit,* 414 F.Supp. 894, 904, 906–07 (W.D.Wash.1976) (in rejecting the Second Circuit test and determining that the shipper's cartons were the packages, the Court relied on a standard which combined the following factors: (1) carrier-owned and supplied containers; and (2) the "plain, ordinary meaning" of the term "package"). This Court agrees with the conclusions of some of the courts which have criticized the Second Circuit's test and views the functional economics test as too narrowly focused on a consideration which is influenced by the economic practicalities of maritime cargo transportation.

of goods then, shippers subject to the functional economics standard either must continue to rely on economical packing methods for containerized shipments and forego recovery of the actual loss incurred, or engage in economic waste by packing the goods sufficiently well to withstand breakbulk shipment prior to their containerization in order to ensure full recovery. *See,* *e. g.,* Simon, *supra,* at 523; DeOrchis, *supra,* at 257. Shippers faced with the latter alternative well may decide to forego containerization entirely, a decision which could be equally detrimental to both shipper and carrier.

This Court acknowledges that the shipper may avoid the above-described dilemma by exercising its right to declare a higher value for the goods being shipped, and the Court does not suggest that the functional economics test irrevocably requires the shipper actually to make a Hobson's choice. This Court views the test with its presumption as to the sufficiency *vel non* of the shipper's packaging as a theoretical determination which, when actuated within the context of contemporary shipping methods, belies the obligation of courts to "foster good commercial practices." *Gulf Italia Company v. American Export Lines, Inc.,* 263 F.2d 135, 137 (2d Cir.), *cert. denied,* 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959) (footnote omitted). *See In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383, 392 (E.D.Va.1979); *Matsushita Electric Corporation of America v. S.S. Aegis Spirit,* 414 F.Supp. 894, 903–08 (W.D. Wash.1976); *see also, Smythgreyhound v. M/V Eurygenes,.* # 75–2914 (S.D.N.Y. August 26, 1980) (slip opinion).

Some courts have observed that "considering the containers as the packages promotes uniformity and predictability," *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 20 (2d Cir. 1969) (Hays, J., dissenting), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), "at least where [they] contain[ ] goods of a single shipper," *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 815 (2d Cir. 1971), although those courts did not rely on that talismanic formula as a reason for decision. The *Leather's Best* Court, in fact, determined that the container was not the package on the facts of that case, and has been cited as advancing the hypothesis that a container rarely should be treated as a package.[9] *See Yeramex International v. S.S. Tendo,* 1977 A.M.C. 1807, 1829 (E.D.Va. 1977). No court has relied completely on the *Encyclopaedia Britannica* observation and thereby indicated approval of an automatic finding that a container is a package without consideration of other factors; however, in dicta, the *Leather's Best* Court suggested an easily applied standard which resembles an automatic finding. That Court suggested that a finding that the container is the package might be appropriate if two conditions are met, as follows: (1) the shipper packs and seals a container already on its premises; and (2) the bill of lading contains no information regarding the number of cartons, packages or bales within the container. *See Leather's Best, Inc. v. S.S. Mormaclynx, supra,* at 815; *see also, Royal Typewriter Company, Division Litton Business Systems, Inc. v. M/V Kulmerland,* 346 F.Supp. 1019, 1024–25 (S.D.N. Y.1972), *aff'd,* 483 F.2d 645 (2d Cir. 1973).

**9.** The Court in *Leather's Best* quoted Judge Hays' statement about containers with some approval; however, that Court ultimately rejected the "containers as the packages" formula as any universal solution, and found that " 'package' is ... more sensibly related to the unit in which the shipper packed the goods and described them...." *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 815 (2d Cir. 1971). The *Leather's Best* Court did leave open, however, what the result would be if the shipper had packed the goods "in a container already on its premises and the bill of lading had given no information with respect to the

number bales [within the container]." *Id.* at 815. The *Leather's Best* Court did not intimate, nor does this Court, that Judge Hays had propounded the "containers as the packages" statement as a universally applicable standard. Judge Hays merely articulated that consideration among others as reason for his determination that the containers were the packages on the facts of the case before him; the majority did not reach the package issue. *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 20 (2d Cir. 1969) (Hays, J., dissenting), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

In the context of a pallet case, the court in *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft*, 375 F.2d 943, 946 (2d Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967), concluded that pallets, each containing six cartons, were the COGSA packages pursuant to an analysis which involved few factors: (1) the documents contained descriptions only of the number of pallets; (2) the shipper chose to palletize the cargo; and (3) the shipper had not exercised its option to declare a higher value. *Id.* at 946. On the basis of the *Standard Electrica* standard, at least one commentator has suggested that only two inquiries need be made in any container or pallet case: (1) did the shipper choose to use the pallet or container; and (2) did the bill of lading describe the pallet or container as a "package". DeOrchis, *supra*, at 252.

■ This Court acknowledges that consistently considering containers as packages, or relying on an uncomplicated standard such as that proposed by DeOrchis would promote uniformity and predictability in this much-litigated area, and "[a]s is usual where a question arises whether a particular container is a 'package' for purposes of § 4(5), there is a clamor for predictability." *Shinko Boeki Co., Ltd. v. S.S. "Pioneer Moon"*, 507 F.2d 342, 345 (2d Cir. 1974) (citations omitted). "[Predictability], however, could be obtained as well by generally disregarding the final container," *id.* at 345, an approach suggested by plaintiff herein, pursuant to resolution of two inquiries: (1) who owns the container; and (2) whether the carrier had notice of the contents of the container on the bill of lading.[10] *See also, Yeramex International v. S.S. Tendo, supra,* at 1829. As the *Shinko Boeki* Court observed, "certainty at the expense

**10.** Apparently plaintiff relies on two considerations for the formulation of its standard. First, plaintiff asserts that inasmuch as a container is functionally part of the ship, characterizing the container as a package favors the carrier interests and thus undermines the purposes of COGSA to avoid adhesion contracts wherein carriers with superior bargaining power unreasonably can limit their liability for negligence. Plaintiff finds some support for its assertion among the courts which have considered the container/package issue. *See, e. g., Shinko Boeki Co., Ltd. v. S.S. "Pioneer Moon"*, 507 F.2d 342, 345 (2d Cir. 1974); *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir. 1971); *Smythgreyhound v. M/V Eurygenes,* # 75–2914 (S.D.N.Y. August 26, 1980) (slip opinion); *Matsushita Electric Corporation of America v. S.S. Aegis Spirit*, 414 F.Supp. 894, 907 (W.D.Wash.1976); *cf. Yeramex International v. S.S. Tendo*, 1977 A.M.C. 1807, 1829 (E.D.Va.1977) ("Two Second Circuit decisions written by then CHIEF JUDGE FRIENDLY suggest that a container should rarely, if ever, be labeled the package for purposes of the COGSA liability provision.") *Id.* at 1829, citing *Leather's Best* and *Shinko Beiko.*

That support, however, must be regarded as tenuous. The above-described characterization of containers as part of the ship originated in the *Leather's Best* opinion; yet, even that Court left open the question of whether the container would be deemed a package under certain conditions. Refer to p. 678 & note 9, *supra*. This Court perceives much difficulty in analogizing a container to the hold of a ship depending on which party packed it and which party had notice of its contents. If a

container is functionally a part of the ship, it should be so regardless of other factors. Accordingly, the Court declines to adopt the characterization or to consider it as part of the package inquiry.

Second, plaintiff asserts that notice to the carrier and ownership of the container are the only two factors consistently used by all of the courts which engage in factor analysis of the instant issue. The plaintiff is correct with regard to consideration of notice to the carrier. *See, e. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc.*, 543 F.2d 967 (2d Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *Leather's Best, Inc. v. S.S. Mormaclynx, supra; Smythgreyhound v. M/V Eurygenes, supra; In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.*, 478 F.2d 383 (E.D.Va.1979). Also, the plaintiff correctly asserts that several courts have weighed the ownership of the container as a consideration. *See, e. g., In re Norfolk, Baltimore & Carolina Line, Inc., supra; Yeramex International v. S.S. Tendo*, 1977 A.M.C. 1807 (E.D.Va.1977); *Matsushita Electric Corporation of America v. S.S. Aegis Spirit*, 414 F.Supp. 894 (W.D.Wash.1976); *Sperry Rand Corporation v. Norddeutscher Lloyd*, 1973 A.M.C. 1392 (S.D.N.Y.1973). None of those courts, however, relied solely upon either notice or ownership or a combination of only the two factors. Each court considered various other factors as well, and this Court is persuaded to follow their example. Refer to discussion at pp. 684–685, *infra.* Plaintiff argues for an extremely narrow inquiry which is unacceptable to this Court.

of legislative policy and equity is undesirable and often turns out to be ephemeral." *Shinko Boeki Co., Ltd. v. S.S. "Pioneer Moon", supra*, at 346 (citation omitted). This Court has an obligation to effectuate the legislative intent of COGSA by developing a standard which achieves a balance between competing interests and thereby reflects the policies and principles which Congress sought to implement through the Act and the package limitation provision. Accordingly, the Court declines to adopt either a "container is package" or a "container never is package" formula. Each inherently is skewed to shield one or the other of the competing interests, and each involves an inadequate consideration of the various factors which should be part of the container/package inquiry.

■ In addition to the functional economics test and the other standards discussed above, courts most frequently have relied on two methods of analysis to resolve the package issue. Although those courts have not labeled those standards, in the interests of clarity this Court has identified the standards as follows: (1) the "plain meaning" standard, *see, e. g., Hartford Fire Insurance Company v. Pacific Far East Line, Inc.*, 491 F.2d 960, 963 (9th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *Yeramex International v. S.S. Tendo*, 1977 A.M.C. 1807, 1835 (E.D. Va.1977); *Matsushita Electric Corporation of America v. S.S. Aegis Spirit*, 414 F.Supp. 894, 907 (W.D.Wash.1976); *cf. American & Far Eastern Trading Company v. Sea-Land Service, Inc.*, 493 F.Supp. 125, 128 (N.D.Calif.1980) (in ruling that each carton, rather than each pallet, was the package, the Court considered several factors and then found that the "plain, ordinary meaning" standard of *Hartford* helped "tip the scales in plaintiff's favor", *id.* at 128); and (2) the "packaging preparation which facilitates handling" standard, *see, e. g., Nichimen Company, Inc. v. M/V Farland*, 462 F.2d 319, 334–35 (2d Cir. 1972); *Aluminios Pozuelo, Ltd. v. S.S. Navigator*, 407 F.2d 152, 155 (2d Cir. 1968); *cf. Hartford Fire Insur-*

*ance Company v. Pacific Far East Line, Inc., supra*, at 965 ("Any distinction based upon the subjective purpose for which the skid was attached [to the electrical transformer] should not be the test for resolving the issue.").

The "packaging preparation which facilitates handling" standard does not require that a package be completely enclosed, *see, Aluminios Pozuelo, Ltd. v. S.S. Navigator, supra*, at 155. Some courts, however, have weighed complete enclosure as a dispositive factor. *See Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft*, 375 F.2d 943, 948 (2d Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967); *Mitsubishi International Corporation v. S.S. Palmetto State*, 311 F.2d 382, 384 (2d Cir. 1962), *cert. denied*, 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963) ("an article completely enclosed in a wooden box prepared for shipment is a 'package' within Section 4(5) of COGSA, regardless of the size and weight of the package.") *id.* at 384; *Gulf Italia Company v. American Export Lines, Inc.*, 263 F.2d 135, 137 (2d Cir.), *cert. denied*, 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959). Whereas both the "packaging preparation which facilitates handling" standard and the "complete enclosure" factor likely would assist a court in considering the package status of a pallet or a large unboxed piece of machinery, neither inquiry is particularly applicable to a container problem. Further, this Court perceives those two standards, as well as the "plain meaning" standard, as resulting in insufficient consideration of the many other factors which might be pertinent to the resolution of a given container/package issue.

■ Any meaningful synthesis of the many authorities herein cited must begin with an assessment of the legislative intent in promulgating the Act and in establishing the per package limitation of liability, a task which involves some reconciliation of divergent opinions not unlike the harmonizing which is necessary for resolution of the

container/package inquiry itself.[11] The courts which have considered the scope of COGSA and the applicability of certain of its limitations have not agreed completely on the purpose of the Act. *Compare Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft,* 375 F.2d 943, 945 (2d Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967) ("[COGSA] had as its central purpose the avoidance of adhesion contracts, providing protection for the shipper against the inequality in bargaining power.") *id.* at 945 (citations omitted) *with Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico,* 455 F.Supp. 310, 318 (D.Md.1978), *rev'd on other grounds,* 607 F.2d 322 (4th Cir. 1979) ("COGSA was the result of a compromise . . . which 'was designed to strike a balance between the interests that sought to fully exonerate the carrier from all claims based upon his negligence and on the other hand, the shippers and commercial interests who wish to hold the carriers responsible for the consequences of any sort of negligence.'") *id.* at 318, quoting *Wirth Limited v. S/S Acadia Forest,* 537 F.2d 1272, 1277 (5th Cir.), *rehearing en banc denied,* 5 Cir., 541 F.2d 281 (1976).

In particular, courts have expressed divergent views of the purpose underlying the package limitation provision of the Act. *Compare In re Complaint of Norfolk, Baltimore & Carolina Line, Inc., supra,* at 388 ("Section 4(5) of the Act was intended to remedy this imbalance [between shippers and carriers with superior bargaining power] by establishing a reasonable figure below which the carrier should not be permitted to limit his liability.") *id.* at 388 (citations omitted) *with Inter-American Foods, Inc. v. Coordinated Caribbean Transport, Inc., supra,* at 1336 ("The intent and purpose of this section [4(5)] are to protect the carrier from claims by the shipper for damages to the contents of a package prepared by that shipper when the nature and value of such contents have not been declared and included in the bill of lading.") *id.* at 1336.

Although adhesion contracts were, and to some extent still are, a reality of maritime cargo transportation, the Court is persuaded that Congress more likely relied upon the compromise-between-competing-interests purpose espoused by the *Commonwealth Petrochemicals* Court in promulgating COGSA. Further, the Court is persuaded that the compromise purpose was discerned by Congress as encompassing the more narrowly focused concern evoked by shippers being forced into adhesion contracts. Inasmuch as the intent of Congress

11. Somewhat akin to the conflict apparent in the congressional intent analyses is the disagreement among courts and commentators, and between the parties herein, with regard to whether the carrier or the shipper benefits more from the use of containers. *See, e. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc.,* 543 F.2d 967, 970 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *Royal Typewriter Co., Division Litton Business Systems, Inc. v. M/V Kulmerland,* 483 F.2d 645, 647 n.3 (2d Cir. 1973); *Matsushita Electric Corporation of American v. S. S. Aegis Spirit,* 414 F.Supp. 894, 901 & n. 24 (W.D.Wash.1976); *Leather's Best, Inc. v. S. S. Mormaclynx,* 313 F.Supp. 1373, 1376 (E.D.N.Y. 1970), *aff'd in part and rev'd and remanded in part,* 451 F.2d 800 (2d Cir. 1971); Simon, *More on the Law of Shipping Containers,* 6 J.Mar.L. & Com. 603, 607–08 (1975). Much as the realities of the 1936 maritime conditions are persuasive of an adoption of the compromise purpose of COGSA, the realities of current maritime cargo transportation practices require the Court to conclude that containerization is beneficial, and most likely equally so, to both the shipper and the carrier. Accordingly, the Court determines that the economic benefits which accrue to one side or the other by the use of containers are to be accorded little weight in the final resolution of, or the method of analysis, used in the package issue. *Cf. Cameco, Inc. v. S. S. American Legion,* 514 F.2d 1291, 1299 (2d Cir. 1974) (in determining that refrigerated container in which canned hams were shipped was not a single package, the Court considered the following factors, among others, with regard to assessing the intent of the parties: "Here the use of the container was as much for the shipowner's benefit as for the shipper's. Here the ship was a containership, and these goods could not have been shipped by way of the ship absent a refrigerated container, since there was no refrigeration as such in the ship. Here a 10 per cent discount was supplied the shipper on the basis that the carrier could avoid stuffing and unstuffing or loading and unloading costs thereby.") *id.* at 1299.

in promulgating COGSA was a comprehensive one of achieving balance between shipping interests and carrier interests, rather than an intent exclusively to protect shippers, this Court perceives as reconcilable within the scope of that purpose the divergent assessments of the legislative intent underlying the package limitation which were articulated by the *Norfolk* Court and the *Inter-American Foods* Court. In promulgating the package limitation provision, Congress likely anticipated fact situations in which the carrier would need protection as well as those in which the shipper would need protection, and it intended to formulate a provision which would result in an equitable resolution in either circumstance.

Having determined the congressional purpose underlying COGSA and the package limitation, this Court must formulate a method of analysis which most accurately will effectuate that intent, regardless of the factual setting in which such a question arises. In resolving each container/package issue and in developing an analytical construct whereby such resolution may be accomplished, the Court is mindful that the essential inquiry is not "whether Congress intended the term 'package' to include shipping containers. Rather, [the Court] must determine whether the policies and principles which Congress intended to implement through that Act are properly applied and advanced by including the containers in this case among 'packages' for the purpose of section 4(5)." *In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.*, 478 F.Supp. 383, 388 (E.D.Va.1979).

To be satisfactory, a test for determining whether a container is a package must reflect the realities of the maritime industry of today while remaining faithful to the express language and legislative policy embodied in the pertinent COGSA provisions. Regarding the latter objective, this Court's function is not to create *ex nihilo* a fair and equitable rule for allocating risks with respect to containerized cargo; but, rather, to fairly and sensibly interpret the existing legislation.[12]

*Matsushita Electric Corporation of America v. S. S. Aegis Spirit*, 414 F.Supp. 894, 903–04 (W.D.Wash.1976). The above-quoted observation from *Matsushita* served as the foundation of that Court's formulation of a container/package test.[13] In the course of formulating that test, the Court rejected the functional economics test "as contrary to the statute, commercially impracticable and unwise," *Matsushita Electric Corporation of America v. S. S. Aegis Spirit, supra*, at 906, and identified the serious flaw of the Second Circuit's test as its focus on the intent of the parties. The *Matsushita* Court found that "[t]he better and more traditional approach, . . . is to conscientiously construe the legislation in the factual context seeking to effectuate the *legislative*, not the parties', intent and purpose." *Id.* at 904 (emphasis in original). The Court further observed that the "liability floor becomes illusory and negotiable" if the parties "are allowed to christen something a 'package' which distorts or belies the plain meaning of this word as used in the statute. . . ." *Id.* at 905.[14]

**12.** When a court focuses on the application of the "policies and principles which Congress intended to implement through [COGSA]", *In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.*, 478 F.Supp. 383, 388 (E.D.Va.1979), and on fairly and sensibly interpreting the legislation consistent with the underlying policies, *Matsushita Electric Corporation of America v. S. S. Aegis Spirit*, 414 F.Supp. 894, 903–04 (W.D.Wash.1976), any consideration of whether the application of an outdated package limitation "is an insurance rather than an equitable problem," DeOrchis, *The Container and the Package Limitation—The Search for Predict-*

ability, 5 J.Mar.L. & Com. 251, 253 (1974), is obviated.

**13.** The test which the Court used was derived from *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d 800 (2d Cir. 1971) and *Hartford Fire Insurance Company v. Pacific Far East Lines, Inc.*, 491 F.2d 960 (9th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). *See Matsushita Electric Corporation of America v. S. S. Aegis Spirit*, 414 F.Supp. 894, 903–08 (W.D.Wash.1976).

**14.** The Court acknowledged that "the parties' characterization may often be wholly reasonable and consistent with the language and pur-

This Court agrees with the *Matsushita* Court that judicial interpretation of the statute must control, *id.* at 905, and further acknowledges that "the parties cannot, consistent with COGSA, by their private intentions or characterizations make something which is not a COGSA package into a COGSA package." *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico,* 455 F.Supp. 310, 321 (D.Md.1978), *rev'd and remanded,* 607 F.2d 322 (4th Cir. 1979). Those premises, however, are not incompatible with a court's giving effect to the intention of the parties in determining what is a package, as the Second Circuit and other courts have done. First, consideration of the parties' intention is compatible with the compromise-between-competing-interests purpose of the Act, refer to discussion on pp. 680–681, *supra.* Second, Section 4(5) of the Act, 46 U.S.C. § 1304(5) (1975), apparently permits consideration of the intention of the parties pursuant to the following language:

> Neither the carrier nor the ship shall in any event be or become liable ... in an amount exceeding $500 per package ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. *This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.*

46 U.S.C. § 1304(5) (1975) (emphasis added).

Further, consideration of the intent of the parties is particularly, although not exclusively, appropriate where, as in the instant cause, COGSA does not apply of its own force. Refer to note 1, *supra.* "Where a statute is incorporated by reference its provisions are merely terms of the contract evidenced by the bill of lading." *Pannell v. United States Lines Company,* 263 F.2d 497, 498 (2d Cir.), *cert. denied,* 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959) (citations omitted); *see Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico,* 607 F.2d 322, 325 (4th Cir. 1979). Unlike the parties in *Pannell* and *Commonwealth Petrochemicals,* the parties herein have not included a definition of "package" in the applicable bill of lading; accordingly, the Court will analyze the issue pursuant to the COGSA definition. *See In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383, 388 (E.D.Va.1979). The Court, however, is not precluded from considering the intent of the parties in that inquiry. *See, e. g., Smythgreyhound v. M/V Eurygenes,* # 75–2914 (S.D.N.Y. August 26, 1980) (slip opinion).

In order to achieve the dual objectives of reflecting the intent which motivated promulgation of the Act and determining the intent of the parties as it functions to effectuate the legislative purpose, this Court concludes that a multi-factor evaluation by virtue of its adaptability is the most satisfactory rationale on which to rely.[15] The decision in *In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383, 392 (E.D.Va.1979) (*Norfolk*) most closely reflects the approach to the container/package issue that this Court deems appropriate. The *Norfolk* Court listed twelve criteria,[16] which were

---

pose of the statute," *Matsushita Electric Corporation of America v. S. S. Aegis Spirit,* 414 F.Supp. 894, 905 (W.D.Wash.1976), but stressed that the controlling factor must be the court's interpretation of the statute rather than the parties' characterizations. *Id.* at 905.

**15.** Use of multi-factor analytical constructs is not uncommon in determining other legal issues. *See, e. g., Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1952) (Jones Act jurisdiction); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974) (award of attorney's fees); *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979) (conflicts of laws).

**16.** The Court specified the criteria as follows:

(1) Whether the carrier actually possesses superior bargaining strength sufficient to coerce the shipper's agreement to adhesion contract;

(2) Whether the parties treated the container as a single unit in their negotiations, on the documents of contract, and in determining the shipping rate;

(3) Whether the shipper, or at least one other than the carrier, chose to ship the goods in container;

(4) Whether the shipper or carrier procured the container;

not intended to be exhaustive, [but] designed to determine whether a particular container ... may reasonably be considered a ... package by illuminating the intent of the parties and their actual ability to foresee and allocate the risks of carriage, and thereby to protect their respective interests. [The criteria] also advance Congress' intent, through COGSA, to eliminate adhesion contract, and to assure that each of the parties to the agreement understands its risks and is provided with an adequate opportunity to protect its interests, without unduly burdening either party or impeding maritime commerce.

*Id.* at 392–93. That decision has been criticized as too complex to afford much assistance to the industry, *see Smythgreyhound v. M/V Eurygenes, supra,* and this Court acknowledges that a multi-factor analysis provides little comfort to those who seek some form of short cut to predictability of result with regard to this issue. Predictability and certainty for the contracting parties, however, cannot be the controlling consideration. *See Shinko Boeki Co., Ltd. v. S.S. "Pioneer Moon",* 507 F.2d 342, 346 (2d Cir. 1974). Nor can "the determination whether a particular container is a COGSA package ... be controlled by a talismanic formula. Rather, that determination rests upon an analysis of the facts presented in each case, informed by the policy which Congress sought to implement by enacting COGSA." *In re Complaint of Norfolk, Baltimore & Carolina Line, Inc., supra,* at 392. In order to accommodate a meaningful inquiry into the facts of a given case, this Court feels constrained to apply a test which not only encompasses the multi-

pronged *Norfolk* approach, but also includes two additional factors discernible in the cases which should be considered, wherein appropriate. By identifying fourteen (14) criteria, this Court does not suggest that each criterion will be applicable or must be considered in every instance. Nor is the following list proposed as an exhaustive one. The Court, with the able assistance of the parties, has attempted to identify and analyze the many "package issue" decisions which have been rendered throughout the circuits and to glean therefrom the factors most consistently identified as pertinent.

Accordingly, the Court enumerates the following as applicable inquiries in determining what constitutes a package in a container case:

(1) "Whether the carrier actually possesses superior bargaining strength sufficient to coerce the shipper's agreement to adhesion contract; ..." *Norfolk, supra,* at 392;

(2) "Whether the parties treated the container as a single unit in their negotiations, on the documents of contract, and in determining the shipping rate; ..." *Norfolk, supra,* at 392; *see also, Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft, supra,* at 946 *(Standard Electrica); Menley & James Laboratories, Ltd. v. M/V Hellenic Splendor,* 433 F.Supp. 252, 254 (S.D.N.Y.1977) *(Menley & James); Sperry Rand Corporation v. Norddeutscher Lloyd,* 1973 A.M.C. 1392, 1398 (S.D.N.Y.1973);

(3) "Whether the shipper, or at least one other than the carrier, chose to ship the goods in container; ..." *Norfolk, supra,* at 392; *see also, Standard Electrica, supra,* at 948; *American & Far Eastern Trading*

(5) Whether the goods were delivered to the carrier previously loaded into the container;
(6) Whether the goods were loaded by the shipper or by the carrier;
(7) Whether the carrier actually observed the contents of the container before it was sealed for shipment;
(8) Whether the container was loaded with the shipper's goods only, and not those of any other shipper;
(9) Whether the markings on the container provided a complete and accurate indication of the contents and their value;

(10) Whether the bill of lading contained any declaration of the nature of the container's contents and their value;
(11) Whether the bill of lading provided the shipper with an adequate opportunity to declare the value of the container and its contents, and to obtain financial protection for any excess value;
(12) Whether the shipper took advantage of this opportunity.
*In re Complaint of Norfolk, Baltimore & Carolina Line, Inc.,* 478 F.Supp. 383, 392 (E.D.Va. 1979).

*Company v. Sea-Land Service, Inc.,* 493 F.Supp. 125, 129 (N.D.Calif.1980) (*American & Far Eastern); Armstrong Cork Canada, Ltd. v. S. S. Red Jacket,* # 74–2770 (S.D. N.Y. December 21, 1979) (slip opinion) (*Armstrong Cork); Menley & James, supra,* at 254;

(4) Whether the contents of the container could have been shipped in the individual cartons or other original packing as they were prepared by the shipper; *see Royal Typewriter Company, Division Litton Business Systems, Inc. v. M/V Kulmerland,* 483 F.2d 645, 648 (2d Cir. 1973) (*Royal Typewriter); American & Far Eastern, supra,* at 129; *Armstrong Cork, supra; Allied International American Eagle Trading Corporation v. S. S. Export Bay,* 468 F.Supp. 1233, 1235 (S.D.N.Y.1979); *Insurance Company of North America v. S/S Brooklyn Maru,* 1974 A.M.C. 2443, 2445 (S.D.N.Y.1974) (*S/S Brooklyn Maru* );

(5) "Whether the shipper or carrier procured the container; . . ." *Norfolk, supra,* at 392; *see also, Royal Typewriter, supra,* at 649; *Leather's Best, Inc. v. S. S. Mormaclynx,* 451 F.2d 800, 815 (2d Cir. 1971) (*Leather's Best); Smythgreyhound v. M/V Eurygenes, supra (Smythgreyhound); Matsushita Electric Corporation of America v. S. S. Aegis Spirit,* 414 F.Supp. 894, 907 (W.D.Wash.1976) (*Matsushita Electric); S/S Brooklyn Maru, supra,* at 2446;

(6) Whether the carrier or another interest owned or supplied the container; *see Leather's Best, supra,* at 815; *Yeramex International v. S. S. Tendo,* 1977 A.M.C. 1807, 1835 (E.D.Va.1977); *Matsushita Electric, supra,* at 907–08; *S/S Brooklyn Maru, supra,* at 2446;

(7) "Whether the goods were delivered to the carrier previously loaded into the container;

(8) "Whether the goods were loaded by the shipper or by the carrier;

(9) "Whether the carrier actually observed the contents of the container before it was sealed for shipment; . . ." *Norfolk, supra,* at 392; *see also, Rosenbruch v. American Export Isbrandtsen Lines, Inc.,* 543 F.2d 967, 969 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976) (*Rosenbruch); Cameco, Inc. v. S. S. American Legion,* 514 F.2d 1291, 1299 (2d Cir. 1974); *Leather's Best, supra,* at 815; *Smythgreyhound, supra; Eastman Kodak Company v. S. S. Transmariner,* 1975 A.M.C. 123, 128 (S.D.N.Y.1974);

(10) "Whether the container was loaded with the shipper's goods only, and not those of any other shipper; . . . *Norfolk, supra,* at 392; *see also, Rosenbruch, supra,* at 969; *Smythgreyhound, supra* ;

(11) "Whether the markings on the container provided a complete and accurate indication of the contents and their value;

(12) "Whether the bill of lading contained any declaration of the nature of the container's contents and their value; . . ." *Norfolk, supra,* at 392; *see also, Rosenbruch, supra,* at 970; *Leather's Best, supra,* at 815; *Smythgreyhound, supra; American & Far Eastern, supra,* at 128;

(13) "Whether the bill of lading provided the shipper with an adequate opportunity to declare the value of the container and its contents, and to obtain financial protection for any excess value; [and]

(14) "Whether the shipper took advantage of this opportunity." *Norfolk, supra,* at 392; *see also, Standard Electrica, supra,* at 946.

■ The facts involved in the cargo preparation are outlined on pp. 672, 675, *supra.* A comparison of those facts with the above-listed criteria reveals the following: (1) all of the inquiries except two must be answered in favor of defendant Shippers Stevedoring;[17] (2) one inquiry must be answered in favor of plaintiff in that the carrier owned the container; and (3) the first inquiry cannot be answered with the information before the Court. Accordingly, the Court finds as follows: (1)

17. The inquiries would be answered in favor of the carrier, and the Court previously has determined that Shippers Stevedoring may benefit to the same extent as the carrier through the Himalaya Clause. Refer to discussion on pp. 673 675, *supra.*

the ocean freight was calculated on a flat container rate; (2) the container was selected, procured, loaded and sealed by the shipper, and no representative of the carrier or Shippers Stevedoring was present during the loading and sealing; (3) the sealed container was delivered by the shipper's supplier to the Goodpasture yard; (4) only plaintiff's goods were loaded into the container; (5) the soda pop could not have been shipped in the individual cartons as packed prior to its being loaded in the container; (6) the bill of lading indicated only "20' Container STC: 1755 cases Delaware Punch"; [18] and (7) the bill of lading afforded plaintiff an adequate opportunity to declare a higher value which the plaintiff did not do.[19] "Under these particular circumstances, which are about as strongly in favor of the carrier [Shippers Stevedoring] as any reported case, this Court believes that there are more reasons for treating the container as a package than there are for taking the opposite view." *Smythgreyhound v. M/V Eurygenes, supra.*

The Court therefore concludes that the container herein is the package which is subject to the $500 limitation of Section 1304(5), defendant Shippers Stevedoring is entitled to the benefit of the $500-per-package limitation and defendant Goodpasture has no liability to plaintiff. Accordingly, the Court hereby orders that defendants'

motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

18. Other courts have construed similar language in bills of lading against the shipper. *See, e. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc.,* 543 F.2d 967, 969 n.3 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *Insurance Company of North America v. S. S. Brooklyn Maru,* 1974 A.M.C. 2443, 2446 (S.D.N.Y.1974).

19. Plaintiff asserts that it was not provided adequate notice of its opportunity to declare a higher value. Plaintiff, however, does not amplify its assertion in any of its memoranda, but, instead, asserts that the opportunity to declare a higher value is irrelevant on the instant facts inasmuch as each of plaintiff's "packages", *i. e.,* cartons of soft drinks, was worth less than $500. The Court finds plaintiff's irrelevancy contention and authority therefor unpersuasive.

The instant bill of lading contains language which expressly incorporates COGSA, provides that the value of the goods shall be deemed to be $500 per package and notifies the shipper of its right to declare a higher value. The question of what language will constitute sufficient notice of an opportunity to declare a higher value currently is pending before the Fifth Circuit, *see Brown & Root, Inc. v. M/V Peisander,* # 77–3277 (5th Cir.), *appealing,* C.A. No. 75–H–2193 (S.D.Tex.1977); however, the contents of the instant bill of lading have been found by other courts to constitute *prima facie* evidence of sufficient notice, which shifts the burden to the plaintiff to prove that the opportunity, in fact, did not exist. *See Tressler Brothers (B. C.) Ltd. v. Italpacific Line,* 494 F.2d 438, 443 (9th Cir. 1974); *Bumble Bee Seafoods v. S. S. Kiku Maru,* 1978 A.M.C. 1586, 1589 (D.Md. 1978); *Siderurgica Del Orinoco C. A. v. M/V North Empress,* 1977 A.M.C. 1140, 1147 (E.D. La.1976). Plaintiff has failed to satisfy that burden. Accordingly, the Court finds that plaintiff had adequate notice of an opportunity to declare a higher value, and plaintiff failed to avail itself of the opportunity.